KARL WAGNER,

                              Plaintiff,                          OPINION AND ORDER

        v.
                                                                 17-cv-159-wmc

ANDREW M. SAUL,
Commissioner of Social Security,

                              Defendant.

Plaintiff Karl Wagner seeks judicial review of a final decision of defendant Andrew M. Saul, the Commissioner of Social Security,[1] under 42 U.S.C. § 405(g), which denied his application for benefits under Title II and Title XVI. On August 21, 2018, the court held oral argument regarding the supportability of the ALJ's November 4, 2016, decision. The parties agree that ALJ Joseph Jacobson was limited to considering a two-month period from October 26, 2010, through December 31, 2010 when evaluating plaintiff's Title II application and a four-year period from October 26, 2010, until November 30, 2014 when evaluating plaintiff's Title XVI application. For reasons explained below, the Commissioner's decision will be affirmed.

---

[1] As reflected in the caption above, Andrew Saul has succeeded Nancy Berryhill as the Commissioner of the Social Security Administration and is now the named defendant in this case. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name. . . .").

## FACTS

### A. Background

On June 1, 2015, this court approved a joint stipulation to remand claimant Karl Wagner's social security appeal to the Commissioner. (AR 618.) The Appeals Council then instructed the ALJ to: (1) "further evaluat[e] the residual functional capacity" because the decision failed to "expressly explain how the mental residual functional capacity restrictions accommodated the claimant's moderate limitations in concentration, persistence or pace"; (2) "further consider[]the opinion of [state agency psychological consultant] Dr. Balunas" because the decision gave "great weight" to his opinion but did "not accommodate or reject all of his limitations"; (3) consider the February 22, 2014, consultative examination by Brenda Reed, Psy.D.; (4) "[f]urther evaluate all opinions of record . . . and give reasons for the weight given"; and (5) "[o]btain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (AR 630-31.) The claimant now appeals from the second of the ALJ decisions.[2]

Claimant is a former design engineer (*see* AR 60-61), who suffers from severe mental illness. He has been working for Walmart since 2014 and has been assigned 40 hours a week beginning about a year after starting, but "[m]any times" is absent. (AR 582.) He testified that "Walmart accommodates me in a lot of different ways" (*see* AR 583-84), but his supervisor declined to document any accommodations made for him. (AR 857.)

---

[2] Claimant filed additional applications based on a stroke he had on August 15, 2015. (*See* AR 785-86, 792.) Additionally, there is a binding decision finding claimant not disabled through October 26, 2010. (*See* AR 111.)

## B. Medical Records

Claimant was diagnosed with several severe mental illnesses. (*See e.g.*, AR 278 ("Diagnoses: schizoaffective disorder, adjustment disorder with mixed disturbance of emotions, dissociative fugue (rule out), antisocial personality disorder, and pure hypercholesterolemia."); AR 347 ("Diagnoses: schizoaffective disorder, chronic paranoid type schizophrenia (rule out), dissociative fugue (rule out), malingering (rule out), unspecified personality disorder, antisocial personality disorder (rule out), pure hypercholesterolem."); AR 529 ("This consumer meets DSM criteria for either Schizoaffective Disorder or Paranoid Schizophrenia. There are signs of a separate anxiety disorder as well.").) Among other manifestations of his mental illness, he reported suffering from "[m]ood swings, auditory and visual hallucinations and paranoid delusions, even when euthymic, in addition to loss of time." (AR 521.) He also described periods where he seems to drift off and daydream and finds himself awakening in a totally different place and in a totally different time and under totally different circumstances." (AR 463.) At various points, his providers further noted that Wagner was "[n]ot showering/bathing/showing 2nd level of poverty." (AR 450; *see also* AR 292 (reporting "an extremely strong smell of body odor," "untidy and disheveled" clothing, and "very poor" hygiene and grooming); AR 437 ("Client presented with dirty clothes, unwashed hair, and redness / skin irritation / skin peeling on his face and neck. He had a strong, foul body odor.").)

Unsurprisingly, Wagner reported having "trouble with maintaining employment due to concentration problems, hallucinations and 'losing time.'" (AR 431.) Additionally,

Wagner's medical records contain numerous references to his desire to receive disability benefits. For instance, in July 2010, he was described as "feeling depressed due to the uncertainty of whether or not he will be awarded disability." (AR 508.) In October 2010, he was "very focused on his recent denial of disability benefits." (AR 466.) In March 2011, "[h]e mentioned trying to get disability quite a bit, which is a strong goal of his" and was "angry that he hasn't received disability yet and feels entitled to it." (AR 377.) In May 2011, Wagner "was hyperfocus[ed] on obtaining SSDI" and "seemed unwilling to engage in problem-solving for alternatives other than disability and, once again, thinks it's owed to him b/c he hasn't maintained steady work." (AR 364.) In August 2011, he was described as seeing disability "as the only solution to his life."[3] (AR 348.)

In April 2012, a therapist even noted that "[i]t is also not clear if he's intentionally presenting in this manner or actually has something wrong." (AR 439.) Wagner's medical records are replete with similar concerns about malingering. (*See e.g.*, AR 360 ("[H]is manner seems exaggerated to display how mentally ill he is in order to prove his case for disability."); AR 377 ("It was my impression that he was over exaggerating symptoms during the apt and wanted to convince me he's very ill. He mentioned trying to get disability quite a bit, which is a strong goal of his."); AR 466 ("On 1 occasion, the patient indicated he felt he had experienced one of his 'hallucinations' during his hospital stay. . . .

---

[3] Of course, some of this obsession with receiving Social Security may be attributable to his illness or even to one of his treatment providers, who documented himself "encourag[ing Wagner] to . . . start planning on how he would like his life to change if he gets Social Security benefits" and to "draw a list of items he will need to live and things he would like to have eventually." (AR 427; *see also* AR 426 ("CSM encouraged him to focus on the positives that this might bring and on forming a plan about where he would like to live and the things he would need if he receives a Social Security benefit.").)

The patient was characterized as presenting with a 'poor acting job' per nursing assessment. . . . [The] patient had apparently exaggerated reports of symptoms, and that his reports were not consistent with clinical presentation.").)  As one treatment provider explained,

> It is difficult to assess Karl b/c he's working hard to get granted disability income and is not highly motivated to improve his condition while trying to prove that he's incapable of working. This complicates the ability to assess how mentally ill he really is b/c there's a secondary gain for him to stay ill. . . .  It's possible that there is a degree of treatable mental illness but the other motives cloud the picture.

(AR 343.)

## C.  ALJ's Decision

As noted above, claimant's case has already been remanded both by this court and the Appeals Council.  (AR 550-51.)  This time, the ALJ once again concluded that "the claimant has not been under a disability within the meaning of the Social Security Act from November 1, 2010, through the date of this decision."  (AR 551.)  Specifically, the ALJ found that claimant engaged in substantial gainful employment from October 31, 2014, until the date of the decision, as he worked at Walmart for 40+ hours per week, except during a two-week period in August 2015, and his earnings were above the level of substantial gainful activity.  (AR 553.)  While claimant's counsel argued that his job was subsidized or accommodated, the ALJ could find no evidence that Walmart was subsidizing his employment, other than statements by claimant himself that he was given easier jobs. (*Id.*)

The ALJ also determined that claimant's cognitive disorder, schizoaffective disorder, personality disorder, affective disorder, and dissociative disorder were severe impairments

"because in combination they significantly interfere with the claimant's ability to engage in basic work activities," (AR 554) but concluded that claimant's impairments failed to meet or equal any listed impairments. (AR 555.) The ALJ further explained that while claimant was found to have only mild restrictions on the activities of daily living in 2013 since then, he has assisted his mother and begun working full-time. (*Id.*) Finally, the ALJ acknowledged claimant's moderate difficulties in social functioning and concentration, persistence or pace, but noted that he had experienced only one or two episodes of decompensation. (*Id.*)

Consistent with those findings, the ALJ determined that claimant could perform medium work, with certain limitations, including "simple, routine, repetitive tasks in a low stress job," "only occasional interaction with the public and coworkers," "no piecework or assembly line-type work," and "he must be allowed to be off task up to 10% of the workday, in addition to regularly scheduled breaks." (AR 557.) This conclusion was premised on: (1) claimant's descriptions of his symptoms being "not entirely consistent with the medical evidence and other evidence in the record"; (2) claimant's acknowledgement at the February 2014 consultative mental exam that he had stopped all treatment and medications eight months earlier, yet was then gainfully employed; (3) reports of exaggerated symptoms in his medical records; and (4) the assignment of relative weights to the medical opinions in the record. (AR 557-62.) While claimant could not perform his past relevant work as a drafter/tool designer and sales clerk with those limitations, the vocational expert testified that claimant could nevertheless work as a laundry worker, industrial cleaner, or hospital cleaner. (AR 563.)

OPINION

On appeal, this court reviews an ALJ's decision and reverses a "determination only where it is not supported by substantial evidence." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Likewise, the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Ultimately, the court must ensure that the ALJ has created an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled. *Id.* (citing *Lopez*, 336 F.3d at 539).

Claimant argues that there are three grounds warranting an outright reversal or, at least, a remand: (1) the ALJ's mental RFC formulation is unsupported; (2) the ALJ improperly evaluated claimant's subjective symptoms; and (3) the ALJ's analysis of the medical opinion evidence is erroneous. Most of these criticisms are centered around the ALJ's reliance on Wagner's workforce reentry in 2014, which led him to conclude that he was not disabled at the time of his alleged November 2010 onset date. (*See* Dkt. #10 at 10, 13-14, 16-17.) As the ALJ noted, claimant "admitted to not having had any treatment since about June 2013," yet "he was able to obtain a job at Wal-Mart." (AR 559.)

## I. Mental RFC

Claimant contends that "[i]t is unclear from this record how the ALJ concluded [he] would be off task for up to 10% of the workday versus the 11% that would be work

7

preclusive." (*See* dkt. #10 at 17-18.)  The government responds that: (1) the ALJ explained his conclusion sufficiently so that the court could follow his path of reasoning;[4] and (2) any error was "harmless," given that the claimant returned to full-time work in 2014. (Dkt. #14 at 1-4.)[5]

While the court agrees with claimant that the ALJ could have provided a more detailed explanation for the 10% off-task limitation, there is more than sufficient evidence to support the ALJ's finding that claimant was capable of medium work based not just on his return to work, but the medical record and opinions of the state agency physicians. Unlike many other cases with a similar challenge to a seemingly arbitrary 10% off-task limitation, plaintiff is unable to point to any opinion of a treating physician suggesting a greater discount is appropriate.  *Smith-White v. Berryhill*, No. 15-cv-612 (W.D. Wis. Sept. 21, 2017) (dkt. #14) (remanding where the ALJ ignored findings of claimant's treating

---

[4] Specifically, the ALJ explained

> that the areas of difficulty in concentration, persistence or pace relate to his ability to perform more complex work (accommodated by limiting him to simple, routine, repetitive tasks); deal with stress (accommodated to limiting to low stress and reflecting that social interaction is stressful requiring limitation to only occasional interaction with the public and coworkers); and sustaining pace (accommodated by precluding piece work and allowing additional time off task).  Limitations of a greater severity or breadth are not supported by the record given the lack of objective abnormalities in the mental status examinations, the lack of ongoing treatment even when free medications are offered, and the ongoing work activity without evidence of improvement in his mental condition.

(AR 562.)

[5] Before the summary judgment briefing was complete, the court ordered the government to "advise why remand is not required" on this issue.  (Dkt. #13 at 1-2.)  Claimant sought leave to file a reply brief addressing the government's opposition and response to this order to show cause, unsure if the case was to be held in abeyance until the show cause order was addressed.  (*See* dkt. #15 at 1.)  This motion is GRANTED.

physician that she had "marked" limitations in concentration, persistence and pace); *Rapp v. Colvin*, No. 12-cv-353-wmc, 2015 WL 1268327 (W.D. Wis. Mar. 19, 2015) (remanding where the ALJ failed to connect state agency physician's limitations to the 10% off-task finding); *Olivarez v. Colvin*, No. 12-cv-884-wmc, 2015 WL 1506084 (W.D. Wis. Apr. 1, 2015) (same); *but see Lanigan v. Berryhill*, 865 F.3d 558 (7th Cir. 2017) (remanding ALJ decision where the record lacked treating physician opinions showing that the claimant was more limited than reflected in the ALJ's RFC).[6]

The court readily acknowledges that at times during the relevant period, plaintiff had mental health challenges that may have caused unemployability, but his symptoms were plainly *not* work-preclusive throughout. Indeed, many of his worst symptoms were self-reported, and the court cannot find that the ALJ was wrong for discounting these, as claimant's treating doctors identified and described troubling malingering behavior and an obsession with receiving disability benefits. *See McKinzey*, 641 F.3d at 889 (the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner").

Claimant also challenges the ALJ's conclusion that he was "generally able to independently sustain his daily activities," including assisting his mother and working full time. (Dkt. #10 at 18.) However, as the government correctly responds, "[t]he ALJ's

---

[6] In *Lanigan*, the Seventh Circuit did remand because the ALJ failed to build a logical bridge connecting the medical opinions to the 10% off-task limitation, as well as failed to explain why the claimant's counselor's opinion was given less weight than the state-agency physicians'. 865 F.3d at 563. Likewise, the Seventh Circuit noted that the ALJ's finding that claimant could frequently have contact with colleagues -- instead of occasionally -- was unsupported. *Id.* at 564. Finally, the ALJ in *Lanigan* lacked evidence of the claimant's successful return to full-time work.

explanation here allows the court to follow the path of reasoning," and that this is enough to warrant affirmance. (Dkt. #12 at 14-15.) Claimant may be right to fault the ALJ's 2013 decision for finding that he had improved sufficiently to assist his mother. (*But see* AR 845 ("My mother insisted that he come live with her. . . . [S]he insisted *he* could help *her* with her physical disabilities[.]" (emphasis added)).) The ALJ was certainly correct in finding in his 2016 ALJ decision that the claimant returned to work. Regardless, the focus of claimant's criticism has been on the ALJ's 10% off-task RFC finding. While ideally the ALJ would have corrected his predecessor's error, this is not a sufficient basis to remand. Indeed, even *after* stopping treatment, plaintiff is able to work at Walmart. In light of arguably "conflicting" evidence here, there is an insufficient basis to reverse the ALJ's decision solely on an unsupported criticism of a 10% off-task limitation that is generally supported and explained by the ALJ.

## II. ALJ's Evaluation of Plaintiff's Subjective Symptoms

Claimant also criticizes the ALJ for his evaluation of claimant's subjective symptoms. Primarily, claimant argues that the ALJ's reliance on treatment notes suggesting that the claimant was a malingerer is contradicted by the acknowledgement that he now works in a retail environment, decreasing the motivation for secondary gain, as well as by the fact that multiple providers did *not* find he was exaggerating, instead finding marked limitations. (Dkt. #10 at 10-11.) In response, the government points to the ALJ's finding that the medical evidence failed to support limitations greater than those incorporated in the RFC, and claimant's severe mental impairments were accounted for in the RFC limitations, especially after discounting for the reports of symptom magnification, which

cut against his most extreme claims.  (Dkt. #12 at 7, 10.)

Accordingly, the remaining questions for the court are: (1) whether the ALJ's decision was supported by "substantial evidence" and (2) whether the ALJ connected his decision to the evidence of record by a "logical bridge."  The answers to both questions are "yes."  The ALJ *could* have found that claimant's long-term challenges rendered him disabled during the relevant time periods, but he also could have found that claimant was not disabled.[7]  Accordingly, this ground also does not warrant remand.

### III. ALJ's Analysis of Opinion Evidence

Finally, claimant argues that the ALJ's analysis of the opinion evidence was erroneous.  First, claimant contends that the ALJ did not address the opinion of Dr. Duxbury, one of claimant's treating physicians.  (Dkt. #10 at 14.)  The government points out, however, that Duxbury never provided "a definite statement about the nature and severity of Plaintiff's impairments or indicate[d] what he could still do," such that the ALJ did not need to formally evaluate her statements.  (Dkt. #12 at 11.)  Dr. Duxbury's opinion also failed to provide specific limitations on claimant's work capacity going forward despite having treated him for almost a year.  In fairness, she did record many of his *symptoms*, including periods of hallucinations, delusions, mood swings, lost time, and complaints about "having two people inside of him, experiencing time loss, and memory loss."  (AR 515, 521.)  As a result, she opined that his "[p]sychotic symptoms require antipsychotics and a supportive environment with minimal highly expressed emotions."  (AR 275.)  She

---

[7] This, of course, is not to say that the record did not show limited time periods where claimant likely was unable to work.  That, however, is not the standard of review on appeal to this court.

also noted his "depress[ion] due to the uncertainty of whether or not he will be awarded disability." (AR 508; *see also id.* at 500, 502, 505.) Other than her opinion that claimant required a "supportive environment with minimal highly expressed emotions," it is unclear what other accommodations would be necessary and, thus, this is not a sufficient basis to remand.

Second, claimant contends that the ALJ improperly weighed the assessment by Dr. Harris in 2012, finding it inconsistent with treatment notes.[8] (Dkt. #10 at 15.) The government notes that the ALJ appropriately considered the relevant factors in giving the opinion little weight, including that the opinion came three months after Harris began treating claimant. (Dkt. #12 at 11-12.) "An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). The factors considered when a treating physician's opinion is not given controlling weight include "[l]ength of treatment relationship and the frequency of examination"; "nature and extent of the treating relationship"; supportability; consistency; specialization; and "[o]ther factors . . . which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d)(2)-(6) (2010).

---

[8] Claimant also argues that the ALJ's reliance on Harris's GAF score is improper because (1) the scale for that score is no longer used by the American Psychiatric Association and (2) that one score is higher than the other GAF scores in his medical record. (Dkt. #10 at 15-16.) Regardless, the ALJ determined that "Dr. Harris's opinion is due very little weight, as the doctor had limited contact with the claimant and made an opinion not supported by his own treatment notes [including an] assessment of a GAF score of 55." (AR 560.) Harris actually notes that claimant's current GAF was 55, which was the highest GAF score in their treatment relationship. (AR 458.) However, this, too, does not warrant remand.

The ALJ's treatment of Dr. Harris is insufficient to warrant remand under this standard of review. During the time that Harris was treating the claimant, he "[d]enie[d] improvement, ha[d] c/o hopelessness, financial strain, & unresolved depression." (AR 452.) At that time, Harris was also described as "[n]ot showering/bathing/showing 2nd level of poverty." (AR 450.) This is certainly consistent with Harris's conclusions that claimant had "chronic depression," with a "poor" prognosis, and would be "[u]nable to meet competitive standards" for "neatness and cleanliness." (AR 459, 461.) However, at the time that Harris offered his opinions, he had been treating claimant for only three months and shortly before claimant's December 2012 hearing.

The ALJ also went to great lengths to explain *why* he discounted Harris's opinion. As the ALJ notes, "[i]f the doctor thought the claimant's condition were more severe, it would have been reflected in abnormalities identified in the office visit notes and throughout the record as a whole." (AR 560.) For instance, there is a disconnect between having "[a]ppropriate [d]ress" (AR 453, 455, 457) and being "[w]ell [g]roomed" (AR 55) on the one hand, and being "[u]nable to meet competitive standards" for "neatness and cleanliness," on the other (AR 461). Further, the ALJ was in a better position than this court to judge the claimant based on his presentation.

Similarly, claimant complains that the ALJ failed to provide sufficient reason for rejecting the opinions of the consultative examiner, Dr. Geiger. Specifically, claimant argues that the ALJ incorrectly suggested that Geiger's analysis conflicted with claimant's presentation during the same period. (Dkt. #10 at 16.) The government basically responds arguing waiver for lack of development and that the "ALJ identified specific

inconsistencies with the record." (Dkt. #12 at 13.) Moreover, unlike Dr. Harris, who was one of claimant's treating physicians, Geiger was only a consultative physician, so his opinion is not entitled to deference in any event.[9]

## ORDER

Accordingly, IT IS ORDERED that:

1) Claimant's motion for leave to file a reply (dkt. #15) is GRANTED.

2) The decision of defendant Andrew M. Saul, Commissioner of Social Security, denying claimant Karl Wagner's applications for benefits is AFFIRMED.

3) The clerk of court is further directed to enter judgment for defendant and CLOSE this case.

Entered this 23rd day of August, 2019.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[9] Claimant raised three other arguments that the government neglected to answer, none of which requires remand. First, he argues that the ALJ incorrectly gave Dr. Reed's opinion little weight because claimant reentered the workforce eight months later, even though that opinion was consistent with other opinions in the record. (Dkt. #10 at 16-17.) Reed's opinion also came about a year and a half after the last treatment note relating to claimant's mental illness (the August 2015 notes relate to a stroke he suffered). Second, claimant argues that the ALJ gave *some* weight to a state agency reviewing physician's opinion, despite him not having the full record before him. (*Id.* at 17 (referring to opinion of Dr. Balunas).) Yet, even though Dr. Balunas only reviewed some of claimant's medical records, he reviewed *everything* available during the relevant time period. Third, he argues that there is no record support for the ALJ's conclusion that claimant could "occasionally" deal with people. (*Id.* at 18.) While the record is full of concerns about claimant's social functioning and his isolation, this, too, is not enough to warrant remand, especially since this limitation is supported by the opinion of Dr. Balunas. (*See* AR 125 ("Claimant is able to perform tasks that involve occasional incidental contact with the general public.").)